**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ARIS ETHERLY,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 07 C 0057 |
| ) | |
| **GREGORY SCHWARTZ,** ) | |
| ) | |
| Respondent. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

On July 17, 1995, then-fifteen year old Aris Etherly was
awakened by police officers at his family's home at approximately
5 a.m. He was taken in handcuffs to the police station, where he
was questioned intermittently over the ensuing hours in conjunction
with a gang-related shooting in Chicago. After initially denying
any involvement in the killing, Etherly later incriminated himself
in statements to law enforcement. He was charged and ultimately
convicted of first degree murder and sentenced to forty years of
imprisonment. Now incarcerated at the Pinckneyville Correctional
Center, where respondent Gregory Schwartz is the acting warden,[1]
Mr. Etherly seeks a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254 to overturn his conviction and sentence. For the reasons
that follow, I grant his petition.

---

[1]Ken Bartley, Pinckneyville's warden at the time Mr. Etherly
filed his petition, was originally named as the defendant in this
action. Bartley is automatically replaced by the acting warden
pursuant to Fed. R. Civ. P. 25(d)(1).

I.

On the night of July 13, 1995, Jeremy Rush was shot and killed while visiting with his friend Henry Wingard on Wingard's front porch. Wingard described the circumstances surrounding the shooting at Mr. Etherly's trial. According to his testimony, Wingard was standing on his porch at 103 W. 112th Street in Chicago, accompanied by Rush. Wingard was a member of the Vice Lords street gang and was wearing a hat turned to the left, signifying his gang affiliation. After hearing gunshots, Wingard ran into the house. He returned to find Rush lying on the steps of the porch, bleeding. Rush later died of a gunshot wound to the head. Wingard did not identify any shooters.

Four days later, five police officers, including Detectives Theodore Golab, Robert Flood, and Cornelius Spencer, arrested Mr. Etherly at his family home. The officers arrived sometime between 5:00 and 6:00 a.m., while Mr. Etherly slept. They awakened Mr. Etherly, then handcuffed him and transported him in a police vehicle to the Area 2 police station. The officers told Mr. Etherly's father that his son was being taken to the police station for questioning, and that Mr. Etherly, Sr., could drive to the station in his own car. Mr. Etherly's father did not go to the station and did not have any contact with his son for the next three days.

Upon arrival at the police station at around 6:00 a.m., Mr.

Etherly was left alone in an interview room until approximately 8:00 a.m., when Youth Officer Frank "Joe" DiGrazia arrived, accompanied by Detective Spencer. At that time, Detective Spencer read Mr. Etherly his *Miranda* warnings and questioned him. Mr. Etherly denied knowing anything about the shooting. He was then left alone in the interview room. The youth officer never spoke to Mr. Etherly, or at all, during the questioning.

At around 10 a.m., Mr. Etherly called Detective Spencer and told him that he wanted to show him where the weapons were located. Mr. Etherly told Detective Spencer that a uniformed police officer had escorted him to the restroom, and, while there, told him he had "an obligation to tell the truth about where the guns were located." *People v. Etherly*, No. 1-97-4582, (Ill.App.1st Dist. 1997) (Rule 23 Order) ("*Etherly*") at 2. Detective Spencer then contacted Detective Golab, who along with Detective Flood resumed Mr. Etherly's questioning. Mr. Etherly was not Mirandized at that time, but Detective Golab reminded Mr. Etherly that the rights of which he had previously been advised were "still in effect." Mr. Etherly again stated that a uniformed officer told him he had an obligation to tell the truth, and that if he helped the police to locate the guns "it would go better for him in court." *Etherly* at 3. Detective Golab testified that he told Mr. Etherly it "was nice he wanted to show us where the weapons were at, but we couldn't promise him anything" other than to "inform the court of his

assistance." (Tr. F27, F41.)  Mr. Etherly said "that's all right."
(Tr. F27)  He was then placed in a police car, without a youth
officer, and led the detectives to the location of the weapons.
Afterwards, Mr. Etherly was returned to the same interview room in
the police station.

Later that day, at around 1:00 or 2:00 p.m., Mr. Etherly was
interviewed by Assistant State's Attorney ("ASA") Joseph Alesia.
Detective Golab and Youth Officer DiGrazia were also present for
the interview.  The ASA introduced himself, explained that he was
a prosecutor and not Mr. Etherly's attorney, and advised Mr.
Etherly of his *Miranda* rights.  Mr. Etherly said that he understood
those rights, then gave a statement.  When the ASA asked Mr.
Etherly if he would be willing to reduce his statement to writing,
or to have the statement transcribed by a court-reporter, Mr.
Etherly agreed to a court-reported statement.

In his court-reported statement, Mr. Etherly said that he was
a member of the Gangster Disciples street gang, and that on the
night of the shooting, he joined several friends--also Gangster
Disciples--who said they wanted to kill some Vice Lords.  When Mr.
Etherly and his gangmates arrived at 112th Street, they saw some
boys on a porch and noticed a hat turned to the left.  Mr. Etherly
and his friends began shooting.  Mr. Etherly fired a total of seven
shots, then ran away as his gangmates continued to fire.  This
statement was the first time Mr. Etherly confessed to any

4

involvement in the shooting.

In response to questions posed by the ASA, Mr. Etherly indicated that he had been treated well by law enforcement, given food ("some chips and pop"), and allowed to use the restroom. He also said that his statement was voluntary. In response to the question, "[h]as anybody made any promises or threats to you in return for your statement?," Mr. Etherly answered "[o]ne of them made a promise. Told me to get the guns." The State's Attorney then asked, "[t]hat's one of the uniformed officers?" and Mr. Etherly responded "yeah." Mr. Etherly later added, in his own handwriting, that the uniformed police officer told him to get the weapons "so the judge would know I helped them."[2] In the handwritten addition, Mr. Etherly was unable to spell any word more than three letters in length, spelling "judge" g-u-b-g-e and "would" w-o-l-e-d, and asking ASA Alesia how to spell the words "know," "helped," and "them." When directed to print his full name on each page of the statement, Mr. Etherly misspelled or miswrote it several times. Youth Officer DiGrazia made no attempt to speak to Mr. Etherly at any time throughout his questioning.

Prior to trial, Mr. Etherly moved, unsuccessfully, to have his court-reported statement suppressed. Evidence elicited at the suppression hearings, and again at trial, raised questions about

---

[2]Law enforcement did not, in fact, inform the trial judge of Mr. Etherly's cooperation. The judge learned of his cooperation for the first time at the suppression hearings. (Tr. F87.)

Mr. Etherly's competence to understand and knowingly waive his *Miranda* rights, and about whether Mr. Etherly was coerced into confessing by the "promises" Mr. Etherly claimed he received from the unidentified uniformed officer. At the suppression hearings, Mr. Etherly's father testified that his son was illiterate and had been in special education since the second grade. He further testified that although his son had a special tutor for each of his classes his first year in high school, he had failed all of his courses. At trial, Rebecca George, a teacher at the Cook County Juvenile Temporary Detention Center where Mr. Etherly was held pending his trial, testified that after she discovered Mr. Etherly could not read or write, she met with him two or three times a week over a five month period to work on phonics.[3] George stated that at the time she began working with Mr. Etherly, he was "completely illiterate," and that their phonics work progressed much more slowly than with other students. George testified that Mr. Etherly spent approximately a month "sounding out really A through E," that it was "very difficult for him to even know what sounds went with A or B or C or D," and that even after five months of work, he had not progressed to the end of the alphabet. George also testified that Mr. Etherly had "a very limited vocabulary...the way he uses words are from how he hears other people use words." (Tr. K122-K124.)

_____

[3]The appellate court did not address George's testimony.

Pursuant to the trial court's order, Mr. Etherly was evaluated in December 1996 by Dr. Philip Pan, a staff psychiatrist for Forensic Clinical Services. Dr. Pan diagnosed Mr. Etherly with "an adjustment disorder with depressed mood, and borderline intellectual functioning." (Tr. C42.) Dr. Pan opined, however, that defendant understood his *Miranda* rights and was able to waive them. The Pan report states:

> [a]lthough he was only marginally cooperative with the interview, I feel that Mr. Etherly understands that he is not required to talk to the police, that the legal system will act upon any information given to them, that he is entitled to have a lawyer present while he is questioned, and that if he can't afford a lawyer that he will be appointed a public defender who he will not have to pay for.

(Tr. C42.)

At the close of trial, Mr. Etherly was convicted of first-degree murder. Throughout his state court appeals, Mr. Etherly argued that his statement to the police should have been suppressed on the ground that it was involuntary.[4] The Illinois Court rejected this argument, concluding that

> while his age, lack of intellectual capacity and lack of criminal background are factors which weigh against admission of the statement, Dr. Pan found that, although defendant had

---

[4]Mr. Etherly appealed his conviction and sentence in both direct and post-conviction proceedings, in which he asserted a number of other claims, a few of which are also presented here. I need not address the details of these proceedings, since it is undisputed that the claim on which I grant Mr. Etherly's petition was properly presented throughout "one complete round" of state court proceedings, and therefore may now be reviewed on the merits. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

borderline intellectual functioning, he understood that he was
not required to talk to police, and that the legal system
would act upon any information given to them.... the totality
of the circumstances indicate (sic) that defendant's
confession was the result of his own decision and not the
result of compulsion or his will being overborne.

*Etherly* at 8-9.

On habeas, Mr. Etherly reiterates the claim that his statement
was involuntary, and that its admission at trial violated his
rights under the Constitution.[5]

II.

My review of the Illinois Appellate Court's decision is
governed by 28 U.S.C. § 2254, which provides a "highly deferential
standard of review." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)
(citing *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). Under the
terms of § 2254, I may grant a petition for a writ of habeas corpus
only if the state court proceedings "resulted in a decision that
was contrary to, or involved an unreasonable application of,
clearly established Federal law" or "resulted in a decision that

---

[5]While the pre-*Miranda* cases of *Haley* and *Gallegos* analyze the
use of coerced confessions with reference to the due process clause
of the Fourteenth Amendment, *Miranda* made clear that the Fifth
Amendment also requires that any statement made to law enforcement
by an individual in custody is inadmissible unless it was obtained
after the individual "knowingly and intelligently waived his
privilege against self-incrimination and his right to retained or
appointed counsel." *Miranda v. Arizona*, 384 U.S. 436, 475 (1966).
The later authorities on which Mr. Etherly relies, beginning with
*In re Gault*, typically analyze the issue with reference to both
amendments. Although Mr. Etherly's petition and supporting
memoranda are not specific on this point, I understand his claim to
assert violations of both his Fifth and Fourteenth Amendment
rights.

was based on an unreasonable determination of the facts in light of the evidence" presented during the state court proceedings. 28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "contradicts the governing law set forth" in Supreme Court cases, or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from" the Court's precedent. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of Supreme Court precedent "occurs when 'the state court unreasonably applies it to the facts of the particular state prison[er]'s case.'" *A.M. v. Butler*, 360 F.3d 787, 794 (7th Cir. 2004)(quoting *Williams* 529 U.S. at 405).

"Where a police interrogation proceeds without the presence of an attorney and the police obtain a statement, 'a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.'" *A.M. v. Butler*, No. 98 C 5625, 2002 WL 1348605 at *16 (N.D. Ill., June 19, 2002) (Pallmeyer, J.)(quoting *Miranda v. Arizona*, 384 U.S. 436, 475 (1966)), *aff'd* 360 F.3d 787 (7th Cir. 2004). The voluntariness of a confession depends on the totality of the circumstances, including "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). Confessions by juveniles "must be evaluated with

'special care.'" *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (quoting *Haley v. Ohio*, 332 U.S. 596, 599 (1948); *In re Gault*, 387 U.S. 1, 45 (1967)). As the Court admonished in *Gault*, "the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." 387 U.S. at 55. Among the relevant considerations in this inquiry are "the juvenile's age, experience, education, background and intelligence, and...whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.*, 442 U.S. 707, 725 (1979) (citation omitted). Courts must also consider the "length of time that the juvenile was questioned by the authorities and the absence or presence of a parent or other friendly adult." *Gilbert*, 488 F.3d at 791.

In its treatment of Mr. Etherly's claim that his statement was involuntary, the appellate court correctly identified the governing "totality of the circumstances" test, then went on to name the factors to be considered: "the defendant's age, education, intelligence, experience, and physical condition; the length of the questioning; whether he was advised of his constitutional rights; the existence of threats, promises, or physical or mental coercion; and whether the confession was induced by police deception." *People*

*v. Etherly*, No. 1-97-4582, (Ill.App.1st Dist. 1997) (Rule 23 Order) ("*Etherly*") at 6 (citation omitted). The court further noted that "additional considerations for juveniles include the time of day when questioning occurred, the presence or absence of a parent or guardian, and the minor's previous experience with the court system." *Id.* (Citations omitted) The court concluded, "[t]he overriding concern, however, is whether the defendant's will was overborne." *Id.* (Citing *People v. Brown*, 169 Ill.2d 132, 144, 661 N.E.2d 287 (Ill. 1996)).

The court then proceeded to analyze Mr. Etherly's claim, placing particular emphasis on the issue of whether his statement was coerced through a promise of leniency. From a constitutional standpoint, its analysis is problematic in several respects. To begin with, while it is certainly true that a coerced statement cannot, consistent with the standards established in *Miranda v. Arizona* 384 U.S. 436 (1966), be deemed voluntary, it does not follow, in the case of juvenile defendants, that any statement free from coercion passes constitutional muster.[6] The Court emphasized just this point in *In re Gault*, where it held that "the greatest care must be taken to assure that the admission was voluntary, in the sense *not only that it was not coerced or suggested, but also*

---

[6]Although *Colorado v. Connelly*, 479 U.S. 157, 170 (1986), suggests that some coercive state action is essential to a finding of involuntariness where adult defendants are concerned, *In re Gault* makes clear that the absence of coercion is not dispositive in juvenile cases.

*that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair.*"  387 U.S. at 55. (Emphasis added). The Seventh Circuit echoed this proposition in *Hardaway v. Young*, 302 F.3d 757, 765 (7th Cir. 2002), when it held that where juvenile defendants are involved, "we will scrutinize police questioning tactics to determine if excessive coercion or intimidation *or simple immaturity that would not affect an adult* has tainted the juvenile's confession." (Emphasis added).  Yet, after singling out coercion (i.e., "whether the defendant's will was overborne") as "the overriding concern," the appellate court held––citing two Illinois cases not involving juvenile defendants––that because the police did not promise Mr. Etherly a "specific benefit" in exchange for his confession, his confession was not involuntary.  *Etherly* at 8.  This reasoning cannot be reconciled with *Gault* and *Hardaway*.

First, I am more than a bit skeptical that any fifteen year old boy, much less one of limited intellectual capacity with no previous experience with the criminal justice system, is likely to grasp the nuanced distinction the appellate court drew between the assurance Mr. Etherly received that "it would go better for him in court" if he helped the police locate weapons, on the one hand, and the promise of a "specific benefit" in exchange for his assistance, on the other.  Even assuming, however, that the appellate court correctly (or at least reasonably) resolved the narrow question of whether the uniformed officer's statement amounted to a "promise of

leniency," it unreasonably failed to consider the likely impact of that statement and subsequent police statements on Mr. Etherly. As the Supreme Court held in *Rhode Island v. Innis*, 446 U.S. 291 (1980),

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. *The latter portion of this definition focuses primarily on the perceptions of the suspect*, rather than the intent of the police.

*Id.* at 300-01. (Emphasis added) While the *Innis* Court was concerned primarily with the scope of the term "interrogation," its observation that the subjective perceptions of the individual in custody are clearly relevant in this context. Indeed, there is no need to speculate about how Mr. Etherly perceived the uniformed officer's statement, since Mr. Etherly made clear that he understood the statement as a "promise," and that his decision to give the police information was based on that promise. Regardless of whether the uniformed officer promised Mr. Etherly a "specific benefit," the statement that it would "go better" for Mr. Etherly in court if he cooperated with the police, and the suggestion that Mr. Etherly had a moral obligation to do so, were, at a minimum, "reasonably likely to elicit an incriminating response" from Mr. Etherly. Accordingly, Mr. Etherly's subsequent statement is

inadmissible under *Miranda* and *Innis* unless he knowingly and intelligently waived his right to remain silent and to consult with counsel.[7]

Yet the appellate court's emphasis on whether Mr. Etherly was coerced through a promise of leniency caused it to gloss over critical factors bearing on whether Mr. Etherly understood (much less knowingly and intelligently waived) his *Miranda* rights. In just one paragraph, the court addressed two key factors pertinent to this issue: first, that Youth Officer DiGrazia was present at certain points during Mr. Etherly's questioning "to ensure that defendant's rights were protected," and second, that Mr. Etherly had received *Miranda* warnings and indicated that he understood

_____

[7]The facts in *Innis* bear an interesting resemblance to the facts of this case. In *Innis*, the suspect was arrested for armed robbery and repeatedly given his *Miranda* warnings. After indicating that he understood his rights, he invoked his right to remain silent and requested counsel. While riding to the police station in the back of a police vehicle, the suspect overheard a conversation between two police officers in the front, in which the officers discussed their desire to find the gun used in the robbery because there was a school for handicapped children in the vicinity. One of the officers stated, "God forbid one of them might find a weapon with shells and they might hurt themselves." At that point, the suspect interrupted the officers' conversation, said that he wanted to show them where the gun was, and directed them to the location where the gun was found. Although the Court ultimately declined to hold that *Miranda* had been violated, reasoning that the record failed to establish that the police "should have known their statements were reasonably likely to elicit an incriminating response," so their statements fell outside the scope of "interrogation," it acknowledged that the defendant had indeed been subjected to "subtle compulsion." In this case, of course, not only was the compulsion significantly less subtle, but the uniformed officer's statements appear to have been designed specifically to elicit an incriminating response from Mr. Etherly.

them.  The court held that both of these factors supported the conclusion that Mr. Etherly's confession was voluntary.

The presence of an entirely passive youth officer, however, does not weigh in favor of a finding of voluntariness.  The Seventh Circuit has made clear that "'a state-provided youth officer who functions as nothing more than an observer will not be considered a friendly adult presence for purposes of the totality of the circumstances.'"  *A.M.*, 360 F.3d at 801 (quoting *Hardaway,* 302 F.3d at 765).  On the facts of this case, it was unreasonable for the court to consider the utterly unhelpful presence of Youth Officer DiGrazia as a factor favoring a finding of  voluntariness.  To begin with, the appellate court grossly understated DiGrazia's role as a "passive" one.  In fact, not only is there no evidence that the youth officer took any affirmative steps to safeguard Mr. Etherly's constitutional rights, I have found nothing in the record to indicate that DiGrazia's ostensible role was even explained to Mr. Etherly, who, from all that the record reveals, had no reason to know what DiGrazia was doing there.  Compare this situation to the one in *Hardaway*.  In *Hardaway*, the ASA explained to the defendant "that Geraci was a youth officer and that he was present as an observer and to assist Hardaway if he had any questions or problems.  Geraci asked Hardaway if there was anything he could assist him with, to which Hardaway responded no."  *Id*. at 761.  Even on these facts, the Seventh Circuit characterized the youth

officer as being "as much assistance to Hardaway as a potted plant" and concluded that there was "no friendly adult presence" during Hardaway's interrogation. *Id.* at 765. The Supreme Court has repeatedly cited the lack of a friendly adult presence as a factor weighing against a finding of voluntariness, *Gallegos*, 370 U.S. at 54-55; *Haley*, 332 U.S. at 600-01, a consideration frequently echoed by the Seventh Circuit. *Gilbert*, 488 F.3d at 792 n.2; *A.M.*, 360 F.3d at 801; *Ruvalcaba*, 416 F.3d at 561 n.1; *Hardaway*, 302 F.3d at 765.

Nevertheless, the appellate court not only weighed DiGrazia's unexplained, passive presence as a factor in favor of voluntariness, it actually faulted Mr. Etherly--a youthful novice in the criminal justice system with borderline intellectual functioning--for failing to avail himself of the assistance of this unidentified individual. I agree with the observation by Mr. Etherly's counsel that embracing the appellate court's reasoning would lead to a perverse result. The presence of a passive youth officer, whose function is to protect the rights of a juvenile, will be held against the juvenile unless the juvenile affirmatively seeks the youth officer's assistance. Such a result cannot be squared with Supreme Court and Seventh Circuit jurisprudence.

The appellate court further erred in considering the *Miranda* warnings Mr. Etherly received as a factor militating in favor of voluntariness. In *Haley v. Ohio*, 332 U.S. 596 (1948), the Supreme

16

Court concluded that no weight at all should be given to the fact that the signed confession of the fifteen year old defendant in that case began with the acknowledgment that he had been advised of his constitutional rights. *Id.* at 605. The Court explained that it would not assume "that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice." *Id.* at 601. The Court made similar observations in *Gallegos*, when it noted that a fourteen year old boy is unlikely to grasp the consequences of his answers to police questioning, and is "unable to know how to prote[c]t his own interests or how to get the benefits of his constitutional rights." 370 U.S. at 54. In *Haley*, the Court concluded that in view of the juvenile defendant's presumed inability to appreciate the consequences of waiving his rights, "we cannot give any weight to recitals which merely formalize constitutional requirements." *Id.* at 601. And in *A.M.*, the Seventh Circuit observed that there was "no reason to believe" that the defendant in that case "could understand the inherently abstract concepts of the Miranda rights and what it means to waive them." 360 F.3d 787, 801 at n. 11.[8]

In this case, police officers and ASA Alesia advised Mr. Etherly of his *Miranda* rights in a formulaic fashion, then asked

---

[8]The Seventh Circuit cited *Grisso*, "Juvenile's Capacities to Waive *Miranda* Rights: An Empirical Analysis," 68 Calif. L.Rev. 1134, 1141-42, 1153-54, 1160 (1980), in which 96 percent of 14-year-olds were found to lack an adequate understanding of the consequences of waiving their rights.

him to acknowledge that he understood those rights, but neither the detectives, nor the ASA, nor Youth Officer DiGrazia made any attempt to probe the boy's actual understanding of the rights recited or asked him to explain the meaning of the warnings in his own words. *Compare Hardaway*, 302 F.3d at 761 (after being advised of *Miranda* rights, juvenile defendant "explained his rights back to [the ASA] in his own words, stating that he did not have to speak with [her] if he didn't want to, that anything he told [her] she could tell a judge in a trial against him, that he could have an attorney there when he was questioned about the case, even if he or his family couldn't pay for one.") Indeed, the evidence is that the *Miranda* warnings Mr. Etherly received exemplified the kind of rote "recitals which merely formalize constitutional requirements" that the Court disregarded in *Haley* because of the defendant's youth. Accordingly, the appellate court arguably transgressed *Haley,* based on Mr. Etherly's age alone, by according any weight at all to the fact that he formally received *Miranda* warnings. This transgression reached the level of unreasonable error, however, when factors beyond Mr. Etherly's youth are taken into account.

At the time of his arrest, Mr. Etherly had no criminal history or experience with the criminal justice system. Like the juvenile defendant in *A.M. v. Butler*, 360 F.3d 787 (7th Cir. 2004), a case in which the Seventh Circuit upheld a grant of habeas relief, Mr. Etherly "was not a seasoned juvenile delinquent." *Id.* at 797;

compare *Michael C.*, 442 U.S. at 726 (finding juvenile confession voluntary where juvenile had "considerable experience with the police" in light of his multiple arrests, time served in a youth camp, and probation); and *Hardaway v. Young*, 302 F.3d 757, 767 (7th Cir. 2002) (finding juvenile confession voluntary where juvenile had nineteen previous arrests). Although the appellate court cited Mr. Etherly's lack of a criminal background as among the factors militating against a finding of voluntariness, it accorded no ascertainable weight to this factor.

Moreover, Mr. Etherly was a learning disabled high school freshman[9] with "borderline intellectual functioning" and a "very limited vocabulary," who was failing all of his classes and unable to read, write, or spell basic words. These factors underscore the unlikelihood that Mr. Etherly's acknowledgment of his *Miranda* rights indicated any meaningful understanding of--much less a knowing waiver of--those rights. *See Winthrow v. Williams,* 507 U.S. 680, 693 (1993) (education of defendant is among "crucial element[s]" to consider in determining voluntariness) (citing

_____

[9]In his court reported statement, which was taken in July (when I presume school was not in session), Mr. Etherly stated that he was in tenth grade. The appellate court found, based on the testimony of Mr. Etherly's father, that Mr. Etherly was a freshman in high school at the time of the events. It is not clear that these facts are inconsistent (a reasonable conclusion is that Mr. Etherly was between his freshman and sophomore years at the time of the events), but in any event, since there is no dispute that Mr. Etherly was functionally illiterate and had failed all of his classes in school, I see no relevance to whether he was formally in his first or second year of high school.

*Clewis v. Texas*, 386 U.S. 707, 712 (1967)); *Reck v. Pate*, 367 U.S. 433, 441 (1961) (defendant's "subnormal intelligence" considered along with youth and lack of previous experience with the police in concluding confession was involuntary). Although the appellate court paid lip service to Mr. Etherly's "lack of intellectual capacity" as a factor weighing against voluntariness, its analysis failed to account for this factor in any meaningful way.

Ultimately, the only evidence the appellate court cited to support its conclusion that Mr. Etherly indeed understood his rights was Dr. Pan's opinion. But the probative value of that opinion is questionable. Dr. Pan's report was prepared in December of 1996, nearly a year and a half after Mr. Etherly's arrest, and it discusses Mr. Etherly's understanding of his rights in the present tense. Thus, on its face, the report says little about whether Mr. Etherly had the ability, at the time of his arrest (as opposed to after spending over a year in custody), knowingly to waive his *Miranda* rights.[10] In light of the overwhelming evidence of Mr. Etherly's serious intellectual shortcomings, it was unreasonable for the appellate court to conclude, based on the Pan report alone, that Mr. Etherly understood and effectively waived the rights that were recited to him in a formulaic manner, without

---

[10]The report does state, "I see no evidence that Mr. Etherly was not able to understand and waive his Miranda Rights." The remainder of the analysis, however, discusses Mr. Etherly's understanding in the present tense.

any guidance or support from any "friendly adult."

                                    III.

    For the foregoing reasons, the Illinois Appellate Court's
determination that Mr. Etherly's confession was voluntary amounted
to a unreasonable application of the Supreme Court's "totality of
the circumstances" test.  A reasonable application of that test to
the facts of this case compels the conclusion that Mr. Etherly's
statement was obtained without due regard for the procedural
safeguards established in *Miranda*, so the admission of that
statement at Mr. Etherly's trial violated his Fifth and Fourteenth
Amendment rights.[11]   Respondent does not contend, nor does it
appear from the record, that this error was harmless under *Brecht
v. Abrahamson*, 507 U.S. 619 (1993).  Accordingly, Mr. Etherly's
petition for a writ of habeas corpus is granted.[12]


                            **ENTER ORDER:**


                            _____
                                **Elaine E. Bucklo**
                            United States District Judge

Dated: August 28, 2009

_____

    [11]Because I find that Mr. Etherly is entitled to habeas relief
on this basis, I need not reach the merits of his additional claims
and express no opinion on them.

    [12]Mr. Etherly's motion for discovery is denied as moot in light
of the present ruling.

                                    21